## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AHMAD B. NURRIDDIN**<br><br>**Plaintiff,**<br><br>v.<br><br>**DANIEL GOLDIN, in his official capacity as Administrator, National Aeronautics and Space Administration**<br><br>**Defendant.** | **Civil Action No. 99-3401 (JDB)** |

## <u>MEMORANDUM OPINION</u>

Plaintiff Ahmad Nurriddin, proceeding pro se, brings this employment discrimination action against Daniel Goldin, in his official capacity as administrator of the National Aeronautics and Space Administration ("NASA"), pursuant to Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. § 2000e <u>et</u> <u>seq.</u>, alleging discrimination based on race, sex and religion, retaliation, and hostile work environment.  Presently before the Court are defendant's motion to amend and defendant's motion for summary judgment.  For the reasons that follow, the Court will grant both of defendant's motions.

## <u>BACKGROUND</u>

The essential facts in this case are not in dispute.[1]  Plaintiff was hired by NASA in May

_____

[1] These facts are drawn from Defendant's Statement of Material Facts as to which There Is No Genuine Issue ("Def.'s Statement").  Plaintiff's response does not dispute defendant's facts, except where noted.  <u>See</u> Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue Precluding Entry of Summary Judgment ("Pl.'s Response").  Plaintiff also filed an additional Statement of Genuine Issues of Material Facts ("Pl.'s Statement "), which does not

1991 as part of a "contractor conversion process" whereby contractors working for NASA were converted to civil servants.  See Def.'s Statement ¶¶ 1-3.  Prior to his conversion, plaintiff worked for the Omega Group, Inc. as a project manager supporting the NASA Educational Affairs Division.  Id. ¶ 4.  Plaintiff's principal responsibilities, prior to the conversion, and immediately thereafter, included shipping, receiving, warehousing, and general dissemination of NASA educational and informational publications.  Id.  Upon the conversion, plaintiff became a Publication Specialist at the GS-12 level.  Id. ¶ 5.  This position did not have promotion potential.  Id.

In October 1991, plaintiff orally complained to the Deputy Director of the Educational Affairs Division at NASA, Frank Owens, that Ms. Bacon, a white female, was converted to a civil servant at two grades above him, and indicated that he wanted to be promoted.  See Pl.'s Statement ¶ 9.  Ms. Bacon worked on an Oklahoma State University contract before being converted to a civil servant at the GM-14 level.  Id. ¶ 3.  After this complaint, and because plaintiff's position had no promotion potential, plaintiff was reassigned to the Elementary and Secondary branch, and took on responsibilities that were more in line with a Program Manager. Id.  Plaintiff contends he should have been immediately promoted to GS-13 because he took on significantly more responsibilities, including some duties previously performed by an employee at GS-13.  See Pl.'s Statement ¶ 13.  Plaintiff also notes that defendant failed properly to document this transfer in plaintiff's official personnel file in contravention of standard agency human resource policy.  Id. ¶ 14.  Plaintiff's official title remained Publication Specialist until February 1995, when it was officially changed to Education Outreach Specialist.  See Pl.'s

---

respond to Def.'s Statement, but instead offers plaintiff's own assessment of the material facts.

Statement ¶ 48.

In December 1992, plaintiff complained to Dr. Robert Brown, Deputy Associate Administrator of the Office of Human Resources, that he had not been promoted yet.  See Pl.'s Statement ¶ 20.  Thereafter, in  February 1993, plaintiff's immediate supervisors, Frank Owens and Dr. Eddie Anderson ("Dr. Anderson"), gave plaintiff responsibility for developing the "Turner Plan."  See Pl.'s Response ¶ 11.  Plaintiff was told that upon successful completion of the Turner Plan he would be promoted to grade GS-13.  Id.  There is some dispute between the parties over whether the Turner Plan was successfully completed.  Plaintiff argues that he successfully submitted several drafts of the Turner Plan.  Id. ¶ 12.  According to defendant, plaintiff submitted the final Turner Plan in May 1995.  See Def. Reply, Ex. R-3, Affidavit of Franklin C. Owens ("Owens Aff.") ¶ 5.  In the interim, defendant contends that plaintiff submitted deficient products.  Id.  While issues with the Turner Plan were ongoing, plaintiff, in March 1994, met with Associate Administrator for the Office of Human Resources and Education at NASA, General Spence Armstrong ("Gen. Armstrong"), and again complained about the lack of a promotion, as well as the fact that plaintiff viewed the hiring of Ms. Bacon at two grades above him as discriminatory.  See Pl.'s Statement ¶ 29.

Then on July 18, 1994, Dr. Anderson issued plaintiff a letter of reprimand that cited plaintiff's "negative attitude and deliberate refusal to properly follow [Dr. Anderson's] explicit instructions."  See Pl. Opp'n, Ex. 68.  The letter also cited plaintiff for his failure to complete assignments on time, and his failure to keep his supervisors abreast of his location.  Id.  In December 1994, plaintiff made his first contact with NASA's Equal Employment Opportunity ("EEO") counselor, complaining of unlawful discrimination and retaliation.  See Def. Mem., Ex.

8.  Plaintiff's EEO complaint was formally filed on February 9, 1995.  Id.  The Equal

Employment Opportunity Commission ("EEOC") accepted for investigation plaintiff's charges

that he was given a letter of reprimand on July 18, 1994 and that he had not received a promotion

since the time of his employment at NASA because of discrimination and retaliation.  See Def.

Mem., Ex. 6.  The EEOC rejected consideration of plaintiff's complaint that because of his race

he had been hired two grade levels below others.  Id.  The EEOC determined that the latter

allegation was not timely filed.  Id.

Besides this EEOC activity in 1995, plaintiff also cites three specific incidents of alleged

discrimination by NASA.  First, in March of 1995 plaintiff was asked to assist a co-worker who

was having difficulty with an agency-owned computer.  See Def.'s Statement ¶ 14.  Plaintiff

found on the computer folders labeled "racist jokes and stories," "sex bulletin board,"

"W/american Heritage," and "Jessica Games."  See Pl.'s Response ¶ 14.  The folders titled "racist

jokes and stories" and "sex bulletin board" were empty, and plaintiff's co-worker Dr. Malcolm

Phelps, who had possession of the computer, was unaware how the icons got on the computer.

Id.  Plaintiff subsequently complained to his supervisor, Dr. Anderson, about the icons on the

computer and requested an investigation.  Id.  Plaintiff, however, did not receive documentation

that would confirm an investigation was actually conducted.  Id.

Second, in October 1995, NASA went through a downsizing and the Education Division,

in which plaintiff worked, was reorganized.  See Second Am. Compl. ¶ 104.  As part of the

reorganization, plaintiff was told that if he wished to continue to work in the Elementary and

Secondary Education Branch, he would be reassigned to the Goddard Space Flight Center in

Greenbelt, Maryland.  See Pl.'s Statement ¶ 52.  Alternatively, plaintiff could remain at NASA

headquarters in Washington, DC, if he accepted reassignment to the Graduate Student

Researchers Program.  Id.  Plaintiff chose to remain at NASA headquarters and his old

responsibilities were reassigned to other NASA employees, some of whom were at a higher pay

grade than plaintiff.  Id. ¶ 53.

Finally, in July and August of 1996 plaintiff requested travel funds to attend the

Advancing Minorities in Engineering Conference in Nashville, Tennessee, at which plaintiff was

invited to give a presentation.  See Pl.'s Statement ¶ 65.  However, NASA denied his request in

September 1996, citing plaintiff's short notice on the request and the fact that he had already

spent his travel allocation.  NASA also said plaintiff's travel plans were not "mission critical."

See Def. Mem. Ex. 19, Affidavit of Malcolm Phelps ("Phelps Aff.") ¶¶ 2-4.

On November 5, 1996, plaintiff again contacted the EEO counselor at NASA, and he

filed a second administrative complaint on April 3, 1997.  See Def. Mem., Ex. 8.  In that

complaint, plaintiff alleged that he was subject to a hostile work environment.  Id.  The specific

incidents cited by plaintiff as comprising a hostile work environment were: (1) denial of travel;

(2) a 1996 e-mail threatening a reprimand; (3) denial of promotion; (4) oral admonishment for

being late to a staff meeting; (5) e-mail admonishment in 1996; and (6) an assistant director

interfered with his ability to perform tasks.  Id.  Plaintiff's 1995 and 1997 administrative

complaints were consolidated for investigation.  Id.  On September 21, 1999, the Final Agency

Decision was issued, which found that NASA had not discriminated or retaliated against

plaintiff.  Id.

## LEGAL STANDARDS

### I.      Motion to Amend

Fed. R. Civ. P. 15(a) governs the amendment of pleadings, and states that leave to file an

amended complaint should be "freely given when justice so requires."  Whether to grant a motion

to amend is within the sound discretion of the district court.  Firestone v. Firestone, 76 F.3d

1205, 1208 (D.C. Cir. 1996).   However, it is an abuse of that discretion to deny a motion to

amend without a "justifying" or  sufficient reason.  Foman v. Davis, 371 U.S. 178, 182 (1962).

These reasons include "undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies . . . undue prejudice to the opposing party . . . futility of

amendment, etc."  Id.  Generally, under Rule 15(a) the non-movant bears the burden of

persuasion that a motion to amend should be denied.  See Dove v. Washington Metro. Area

Transit Auth., 221 F.R.D. 246, 247 (D.D.C. 2004); see also Gudavich v. District of Columbia, 22

Fed. Appx. 17, 18 (D.C. Cir. Dec. 27, 2001) (noting the non-movant "failed to show prejudice

from the district court's action in allowing the motion to amend")

### II.     Summary Judgment

Summary judgment is appropriate when the pleadings and the evidence demonstrate that

"there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed.R.Civ.P. 56(c).  The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its

motion by "informing the district court of the basis for its motion, and identifying those portions

of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252; see also Holbrook v. Reno, 196 F.3d 255, 259-60 (D.C. Cir. 1999).

## III.    Legal Framework Under Title VII

A plaintiff has the burden of establishing a prima facie case of discrimination or retaliation by a preponderance of the evidence. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). To establish a prima facie case of discrimination, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002); Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999). To make out a prima facie claim of retaliation, a plaintiff must establish that (1) he engaged in a

statutorily protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection existed between the two.  Brody, 199 F.3d at 452; Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985); McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984).

If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's burden, however, is merely one of production.  Burdine, 450 U.S. at 254-55.  The employer "need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Id.

If the employer is successful, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  The plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'"  Id. (quoting Burdine, 450 U.S. at 256).  But "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination."  Id. at 147.  Thus, the trier of fact may also "consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'"  Id. (quoting Burdine, 450 U.S. at 255 n.10).  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is

-8-

false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Id. at 148-49.  As the D.C. Circuit has explained:

> Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also Waterhouse v. District of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).

Although the "intermediate evidentiary burdens shift back and forth" under the McDonnell-Douglas framework, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253).  Once the defendant has proffered a legitimate non-discriminatory reason for its action, then, the question is whether that proffered reason is a pretext for discrimination, and at this point the McDonnell Douglas shifting burdens framework disappears, the sole remaining issue is discrimination vel non, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43.  Examination of that issue in this setting therefore requires consideration of all the relevant circumstances in evidence, including the strength of the prima facie case, any direct evidence of

discrimination, any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful discrimination), and any properly-considered evidence supporting the employer's case.  Reeves, 530 U.S. at 147-48; see also Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1151 (D.C. Cir. 2004); Lathram, 336 F.3d at 1089; Waterhouse, 298 F.3d at 993, Aka, 156 F.3d at 1290.

## ANALYSIS

Plaintiff's 192-paragraph Second Amended Complaint contains a laundry list of allegedly discriminatory incidents.  Plaintiff has packaged some (although not all) of these alleged events into nine separate causes of action.  Notwithstanding the length of plaintiff's complaint and the number of counts, he essentially raises three categories of causes of action in his complaint: discrimination, retaliation, and hostile work environment.  Plaintiff's discrimination claims (counts I, II, V & VI) center on allegations of unlawful personnel decisions including a failure of NASA to promote plaintiff.  For his retaliation claims (counts III, IV, VII & VIII) plaintiff reclassifies his allegations of discrimination as claims of retaliation.  Finally, plaintiff includes a list of alleged incidents that he contends amounts to a hostile work environment.  Defendant argues that summary judgment should be granted because plaintiff has failed to exhaust his administrative remedies on some claims, failed to state a prima facie claim, and failed to overcome defendant's legitimate, non-discriminatory justification for the complained of employment actions.  In support of its exhaustion argument, defendant also moves for leave to amend its answer to include the affirmative defense.  The Court will first address defendant's motion to amend, and then turn to defendant's motion for summary judgment.

## I.      Motion to Amend

Because defendant failed to raise the affirmative defense of exhaustion in its answer, it has now moved for leave to amend the answer to include this defense.  See Def. Mot. to Amend at 3.  Without this amendment, defendant could not assert the exhaustion arguments contained in its motion for summary judgment.  See Harris v. United States Dep't of Veterans Affairs, 126 F.3d 339, 344 (D.C. Cir. 1997) (noting that unlike in some circuits, in the D.C. Circuit an affirmative defense cannot be raised for the first time in dispositive motions, but must be raised in responsive pleadings).  Plaintiff vigorously challenges defendant's motion to amend, arguing that defendant's failure to raise exhaustion in its answer has waived this defense.

Generally, an affirmative defense, such as failure to exhaust, must be raised in responsive pleadings.  See Harris, 126 F.3d at 343.  However, the court in Harris also noted that Fed.R.Civ.P. 15 should be used to permit amendment of pleading under appropriate circumstances.  Id. at 343-44.  Under Rule 15, an amendment is generally permitted unless there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies . . . undue prejudice to the opposing party . . . futility of amendment, etc." Foman, 371 U.S. at 182.  Because amendment is to be liberally granted, the non-movant bears the burden of showing why amendment should not be allowed.  See, Dove, 221 F.R.D. at 247.

In this case, plaintiff notes that when defendant challenged his motion to file a Second Amended Complaint, defendant argued that the complaint "sets forth substantially the same factual premise for each count" as did the Amended Complaint.  See Pl. Opp'n to Mot. to Amend at 1.  Plaintiff also contends that he is prejudiced by having to respond to defendant's motion for summary judgment and motion to amend.  Id. at 3.  Finally, plaintiff argues that defendant's

motion should be denied as untimely given the length of time that has passed (eleven months) between the filing of his Second Amended Complaint and the motion to amend.  Id. at 2.

The key issue in considering a motion to amend is whether the non-movant will suffer any prejudice from the amendment.  Plaintiff has not established how he would be prejudiced by permitting this amendment, other than having to respond to the defense, nor can the Court envision a basis for prejudice.  Although eleven months passed between defendant's answer and this motion for leave to amend the answer, there is no evidence that the delay was in bad faith. See Long v. Wilson, 393 F.3d 390, 399 (3rd Cir. 2004) (14-month delay in raising status of limitations defense not prejudicial where no evidence of bad faith); Block v. First Blood Associates, 988 F.2d 344, 351 (2d Cir.1993) (court permitted statute of limitations defense raised for first time four years after complaint filed because no bad faith, and untimeliness of suit not affected by passage of time).  Furthermore, the inclusion of the exhaustion defense does not necessitate additional discovery, as the only relevant fact is whether plaintiff raised the claims in his administrative action.  The affirmative defense of exhaustion is principally a question of the legal significance of plaintiff's failure to exhaust.  Hence, there is no issue of lost evidence.  This amendment also would not preclude plaintiff from raising any arguments or defenses or taking other steps to negate this affirmative defense.  See Block, 988 F.2d at 350 (permitting late affirmative defense where plaintiff's response to the defense was not affected by the delay in raising the defense).  Defendant has briefed the defense in its motion for summary judgment, and plaintiff has responded to those arguments.  Therefore, the Court will grant defendant's motion for leave to amend and permit defendant to amend its answer to include the affirmative defense of failure to exhaust.

## II.     Motion for Summary Judgment

### A.     Failure to Exhaust

Defendant argues that the following claims in plaintiff's Second Amended Complaint were never presented to the EEOC and therefore plaintiff cannot pursue them here[2]: (1) being given a choice to accept new assignments or face being sent to a new office, Compl. ¶¶ 106-107; (2) being assigned responsibilities that were previously conducted by a GS-14, Compl. ¶ 111; (3) not being promoted from September 1994 to December 1996, Compl. ¶ 149; (4) receiving a lowered performance rating for the period of October 1993 to July 1994, Compl. ¶ 56; and (5) being hired two grade levels below other white employees, Compl. ¶ 76.  See Def. Mem. at 8-9. Plaintiff responds that defendant's actions indicate a pattern of discrimination, and therefore defendant's exhaustion argument should be rejected.  Pl. Opp'n at 7.  Plaintiff's sur-reply to defendant's motion for leave to amend the answer also argues that plaintiff is not required to exhaust on retaliation claims.  See Pl. Sur-reply at 3.

It is well-established that a federal employee may assert a Title VII claim in federal court only after a timely complaint has been presented to the agency involved.  See 29 C.F.R. § 1614.105(a); Brown v. Gen. Servs. Admin., 425 U.S. 820, 832 (1976).  The purpose of the administrative exhaustion requirement is to ensure that an agency has notice of a claim and an opportunity to rectify the employee's complaint.  See Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir. 1985).  Accordingly, a plaintiff must bring an administrative complaint to an EEO counselor within 45 days of the alleged incident, or risk losing the right to bring that claim before a federal

---

[2]   Defendant's exhaustion argument applies in so far as these claims are asserted as a cause of action for unlawful discrimination or retaliation.  See Def. Mem. at 8-10.  NASA does not argue that these claims are barred as part of plaintiff's hostile work environment claim.  Id.

court.  See Siegel v. Kreps, 654 F.2d 772, 776-77 (D.C. Cir. 1981); 29 C.F.R.  § 1614.105(a)(1).

This administrative exhaustion requirement applies to all discrete acts of discrimination or

retaliation.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002).

        In the instant case, there is no evidence that plaintiff brought any of the above allegations

before the EEOC.  See Def. Mem., Ex. 6.  Nor does plaintiff contest the fact that these claims

were not presented to or accepted for investigation by the EEOC.  See Pl. Opp'n at 7.  Instead,

plaintiff argues that defendant's exhaustion argument should be rejected because defendant has

exhibited a pattern of discrimination which eliminates the necessity for exhausting each and

every claim.  Id.  Plaintiff also appears to argue that these claims grow out of the earlier EEOC

allegations, which may eliminate the necessity for exhaustion.  Id.  However, the Supreme Court

in Morgan rejected plaintiff's pattern and practice argument for discrete acts of discrimination or

retaliation that had not been separately exhausted but were "sufficiently related" to a properly

exhausted claim.  See Morgan, 536 U.S. at 105. The Court emphasized in Morgan that "strict

adherence to the procedural requirements specified by the legislature is the best guarantee of

evenhanded administration of the law," id. at 108 (citing Mohasco Corp. v. Silver, 447 U.S. 807,

826 (1980)), and that recovery was precluded "for discrete acts of discrimination or retaliation

that occur outside the statutory time period," id. at 105.  Recently, the District of Columbia

Circuit held that although on its facts Morgan bars recovery for discrete acts occurring before the

statutory time period, Morgan has been understood also to bar recovery for discrete acts

occurring after the filing of an administrative complaint, when a plaintiff does not file a new

complaint or amend the old complaint but instead presents these acts for the first time in federal

court.  See Martinez v. Potter, 347 F.3d 1208, 1210-11 (D.C. Cir. 2003); Velikonja v. Mueller,

-14-

315 F.Supp.2d 66, 74 (D.D.C. 2004).

Applying <u>Morgan</u>, then, there is ample evidence in the record to conclude that plaintiff did not administratively exhaust his remedies on the five claims cited above.  In particular, the EEOC explicitly stated that plaintiff's claim that he was hired two grade levels below similarly situated white employees was not brought before the EEOC within the statutorily mandated time. <u>See</u> Def. Mem., Ex. 8.  As to the other four claims, examining the Final Agency Decision, there is no evidence that plaintiff raised any of them.  As such, to the extent that these allegations are claims of discrete discrimination or retaliation, they are barred for a failure to exhaust administrative remedies.

### B.    Discrimination

With respect to plaintiff's remaining claims, defendant contends that there are no genuine material facts in dispute on plaintiff's discrimination claims, and that plaintiff has failed to establish a prima facie case or that defendant offered a legitimate nondiscriminatory reason for the challenged action.  The Second Amended Complaint contains four counts of alleged discrimination based on race, sex, and religion:  unlawful discrimination in disciplinary action (count I); unlawful discrimination in denied promotion (count II); unlawful discrimination in personnel actions (count V); and unlawful discrimination in denied promotion (count VI).  <u>See</u> Second Am. Compl. ¶¶ 67-79, 142-156.  Each individual count contains a number of specific allegations.  Examining those allegations seriatim, the Court concludes that there are no material facts in dispute, and that plaintiff has either failed to establish a prima facie case or has failed to refute defendant's proffered legitimate nondiscriminatory justification for the questioned employment action.

1.     Discrimination in Disciplinary Action (Count I)

Plaintiff's first count alleges that NASA unlawfully discriminated against him when it issued him a letter of reprimand on July 18, 1994.  See Second Am. Compl. ¶¶ 67-71.  Where there is no direct evidence of discrimination, as in this case,[3] the McDonnell-Douglas burden shifting framework requires that a plaintiff establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  See Stella, 284 F.3d at 145.

For this claim, NASA does not dispute that it issued the letter of reprimand, but rather argues that plaintiff cannot establish that he suffered an adverse employment action as a result of receiving the reprimand.  To establish an adverse employment action, plaintiff must show an action that results in "objectively tangible harm." Brody, 199 F.3d at 457.  A reprimand that "amounts to a mere scolding, without any disciplinary action which follows, does not rise to the level of adverse action." Childers v. Slater, 44 F. Supp. 2d 8, 20 (D.D.C.1999), vacated in part on other grounds, 197 F.R.D. 185, 191 (D.D.C. 2000); see also Stewart v. Evans, 275 F.3d 1126,1136 (D.C. Cir.2002) ("This Court has held that formal criticisms or reprimands, without

---

[3] Plaintiff seems to contend that there is direct evidence of discrimination, so that the McDonnell-Douglas framework does not apply.  See Pl. Opp'n at 8-9.  As direct evidence of discrimination, plaintiff points to Dr. Anderson's statement that: "I am aware that Mr. Nurriddin raised the issue of disparate treatment with Gen. Armstrong.  I believe sometime in 1994.  The reason Frank Owens was upset was that Mr. Nurriddin had an issue that he did not attempt to discuss with his supervisors within the Division before going to see Gen. Armstrong." Id. Although defendant acknowledges that Dr. Anderson made that statement, it is not direct evidence of discrimination, nor does it amount to an admission of discrimination, as plaintiff would argue.  Therefore, the Court will assess plaintiff's claims under the McDonnell-Douglas burden-shifting framework.

any additional disciplinary action such as a change in grade, salary, or other benefits, do not

constitute adverse employment actions.").

Here, plaintiff alleges that the letter of reprimand "reduced [his] chances . . . of being

promoted in a timely manner and receipt of other favorable personnel actions, with

accompanying loss of wages and associated benefits."  <u>See</u> Second Am. Compl. ¶ 69.  However,

plaintiff does not provide evidence of any "tangible harm" that he suffered from the letter of

reprimand, and his statement to the contrary is pure speculation.  Instead, he argues that the letter

was improperly issued, citing to numerous documents in the record that he contends show NASA

should not have issued him the reprimand.  <u>See</u> Pl. Opp'n at 37-38.  But plaintiff's evidence

regarding the appropriateness of the letter of reprimand does not negate his burden of

establishing that he suffered a tangible harm to his employment at NASA from that letter.

Plaintiff has not established that he suffered a reduction in benefits, hours of work or salary, or

that he suffered significantly diminished work responsibilities, all of which would show plaintiff

suffered an adverse employment action.  <u>See</u> <u>Baloch v. Norton</u>, 355 F. Supp. 2d 246, 256-57

(D.D.C. 2005) (discussing ways in which a plaintiff could establish an adverse employment

action).  Furthermore, the allegation that the letter may affect future promotions is too speculative

to be material.  <u>See</u> <u>Broderick v. Donaldson</u>, 338 F. Supp. 2d 30, 42 (D.D.C. 2004) (fact that

letter of reprimand may have affected supervisor's opinion of plaintiff and in turn affected her

chances for promotion too indirect to be adverse employment action).  Drawing all inferences in

favor of plaintiff, the Court concludes that there is no material fact in dispute on this issue.  The

record establishes that plaintiff did not suffer any tangible adverse employment action from the

issuance of the letter of reprimand and thus cannot establish a prima facie case of discrimination

on this claim.

Even were plaintiff able to establish a prima facie case, defendant has also offered a legitimate nondiscriminatory reason for issuing plaintiff the letter of reprimand.  Defendant notes that Dr. Anderson, an African-American and plaintiff's supervisor, issued the formal letter of reprimand after providing plaintiff with a warning regarding assignments that needed to be completed.  See Pl. Opp'n, Ex. 68, July 18, 1994 Letter of Reprimand.  NASA informed plaintiff that he could not go on leave until after his assignments were completed, and although plaintiff failed to complete those assignments, he still took his leave.  Id.  Plaintiff challenges many of the factual allegations contained in the letter of reprimand, arguing that his assignments were complete, and that his leave was approved.  See Pl. Opp'n, Ex. 69, August 10, 1994 Plaintiff Response to Letter of Reprimand.  However, while those may be facts in dispute, and plaintiff may question the accuracy of defendant's judgment in issuing him the letter, these facts are not material for purposes of determining whether defendant's proffered justification is a pretext for discrimination.  See E.E.O.C. v. Flasher Co., 986 F.2d 1312, 1322 (10th Cir.1992) (Title VII does not hold employer liable for erroneous judgment, unless that judgment was motivated by illegal discrimination).  Furthermore, this Court should not become a supervisor of the minutiae of employer's personnel decisions, determining whether or not a particular assignment was completed on time.  See Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) ("Title VII . . . does not authorize a federal court to become a 'super personnel department that reexamines an entity's business decisions'").

Beyond challenging the factual justification of the letter, plaintiff makes unsubstantiated allegations that racism played a role in the issuance of the letter of reprimand, but does not

provide any actual evidence of discrimination.  In particular, plaintiff contends that Dr.

Anderson's comment in the letter of reprimand that plaintiff had a "negative attitude" was a "code

term for 'Upitiy [sic] Negro' who does not know his place."  Pl. Opp'n at 35.  However, this

assertion is based solely on plaintiff's own speculation.  Without evidence, the Court cannot

validate plaintiff's unsubstantiated allegations that racism played a part in the issuance of the

letter.  See Broderick, 338 F. Supp. 2d at 45 (plaintiff's unsubstantiated allegations of racism

regarding the reason for a letter of reprimand insufficient to establish that the letter was

pretextual).  Rather, this Court must determine whether the record contains facts that could show

defendant's proffered justification was a pretext for unlawful discrimination.  On this point, there

is no evidence in the record to indicate that defendant's justification for issuing the letter of

reprimand was pretextual.  Therefore, even if plaintiff were able to establish a prima facie case

on this claim (which he has not done), plaintiff has failed to show defendant's legitimate

nondiscriminatory justification for its action was pretext for illegal discrimination.

### 2.    Unlawful Discrimination in Denial of Promotion (Count II)

Plaintiff's second count alleges that he was unlawfully denied promotions from grade GS-

12 to GS-13 and -14 during the period from October 1991 to September 1994.  This claim is

different from a typical failure to promote claim because plaintiff did not seek promotion to a

vacant position, but rather argues that he should have been promoted during that period because

of his level of duties and responsibilities.  To establish a prima facie case for this type of failure

to promote claim plaintiff must establish that:  he is a member of a protected class; he sought a

promotion for which he was qualified; he was denied that promotion; and "other employees of

similar qualifications . . . were indeed promoted at the time the plaintiff's request for promotion

was denied." Bundy v. Jackson, 641 F.2d 934, 951 (D.C. Cir.1981); Taylor v. Small, 350 F.3d 1286, 1294 (D.C. Cir. 2003); Duckett v. Martinez, 2005 WL 327113, *4 (D.D.C.).

There is no doubt that plaintiff is a member of a protected class. He also requested a grade promotion on at least three separate occasions: (1) in October 1991 after his conversion; (2) in December 1992 after his transfer to the Educational Division; and (3) in March 1994 not long after the promotions of Ms. McGee and Ms. Galloway. The only questions then are whether plaintiff can establish that he was qualified for a promotion during the period in question, and whether other employees with similar qualifications received promotions.

<em>a.</em>    <em>Qualifications For Promotion</em>

To establish that he was indeed qualified for promotion, plaintiff provides his own assessment of his qualifications, duties, and responsibilities, as well as a discussion of why he was qualified for a promotion. He includes an extensive list of his responsibilities (presumably as of October 1991), but fails to cite to the record to support this list. See Pl. Opp'n at 17-19. Of course, plaintiff's personal subjective assessment of his own qualifications does not carry much weight. See Schamann v. O'Keefe, 314 F. Supp. 2d 515, 525 (D. Md. 2004). Plaintiff can also point to his performance appraisals. In 1992 and 1993 he was rated "highly successful," see Pl. Opp'n, Ex.'s 112 and 113, but in 1994 his rating was reduced to "fully successful," see id. Ex. 114.

In response to these arguments, defendant contends that plaintiff was in fact not qualified for a promotion during the period 1991 to 1994. Defendant begins by generally noting that plaintiff could only receive a promotion through an accretion of duties, and during the relevant time period plaintiff never qualified for a promotion. See Def. Reply at 4. In particular,

defendant contends that in May 1991, when plaintiff was hired by NASA, his position as publication specialist did not have any promotion potential.  <u>See</u> Def.'s Statement ¶ 6.  Then, in October 1991, plaintiff was laterally reassigned to the Elementary and Secondary Branch, which provided plaintiff with an opportunity for promotion.  <u>See</u> Def. Reply, Ex. 1, McGee Dec. ¶ 8.  According to NASA, plaintiff did not have an education degree or extensive experience in the field of education, unlike others in the Education division. <u>Id.</u> ¶ 7.  Hence, plaintiff was given fewer responsibilities, including only one long term project, which was commensurate with an employee at the GS-12 level.  <u>Id.</u> ¶ 8.  In addition, defendant notes that plaintiff was not eligible for an immediate promotion upon joining the education division because he had to be trained to handle the new position.  <u>Id.</u> ¶ 12.  According to defendant, the responsibilities and duties outlined in plaintiff's performance review for the period 1991 to 1992 were commensurate with plaintiff's GS-12 level, and defendant notes that plaintiff was only managing one long term project.  <u>Id.</u> ¶ 8.  Over time, the expectation was that plaintiff would have been promoted through an accretion of duties.  <u>Id.</u>  The consensus among plaintiff's supervisors is that during the relevant time period, he was performing work at the GS-12 level, and that his level of responsibilities did not warrant a promotion.  Thus, the Court finds that plaintiff's own assertion of his qualifications is insufficient to raise a genuine issue of material fact as to whether he qualified for an accretion promotion to GS-13.

### b.    *Circumstances Giving Rise to Discrimination*

Even were plaintiff able to establish that he was qualified for a promotion through accretion, he has not shown that similarly qualified co-workers were promoted during the time period.  Although plaintiff's Complaint contains a number of counts, the crux of his problem with

NASA is plaintiff's believe that similarly qualified, or even less qualified employees were promoted to GS-13 and GS-14, while plaintiff remained at GS-12.   To be similarly situated, plaintiff must establish that his employment situation was similar in all relevant regards to those with whom he seeks comparison.   See Phillips v. Holladay Prop. Servs., 937 F. Supp. 32, 37 (D.D.C. 1996), aff'd, 1997 U.S. App. LEXIS 19033 (D.C. Cir. June 19, 1997) ("it is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated in all respects") (emphasis in original); see also Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir.1999) ("A plaintiff ... must demonstrate that all of the relevant aspects of [his] employment situation were nearly identical to those" of his comparables.).

Plaintiff points to two separate occasions on which he argues similarly qualified NASA employees were promoted to GS-13 or GS-14, while he remained GS-12.   First, in May 1991, during the contractor conversation, plaintiff contends that Ms. Bacon, a white female contractor on the Oklahoma State University contract, was converted at the GS-14 level.   See Pl.'s Statement ¶ 3.   He contends that he had a better educational background than Ms. Bacon (a masters in public administration versus a bachelors in education), and therefore should have been at least at the same grade level.   Id.; Pl. Opp'n, Ex. 16.[4]   Besides the conversion, plaintiff alleges that in 1993, Deborah Galloway and Sherri McGee, both white females similarly situated to him, received promotions to the  GS-14 level.   See Am. Compl. ¶ 50; Pl. Opp'n at 22-25; Pl.'s Response ¶ 7; Def. Mem., Ex.'s 2 & 3.   He includes a chart (for which there is no citation to the

---

[4]  Plaintiff also notes that Dr. Julius Dasch, a white male, was converted to a GS-14, but plaintiff does not provide any argument or evidence as to how he would compare to Dr. Dasch. See Pl.'s Statement ¶ 3.

record) comparing his duties and responsibilities with those of Ms. Galloway, but provides no similar comparison to Ms. McGee.  See Pl. Opp'n at 25.

Defendant vigorously challenges plaintiff's comparisons.  First, with respect to Ms. Bacon at the time of conversion, defendant contends that plaintiff did not have the requisite educational background usually required of Education Division employees, and therefore was brought in at a level commensurate with his limited experience and education in the field.  See Def. Reply, Ex. 1, Declaration of Sherri McGee ("McGee Dec.") ¶ 8.  On the comparison with Ms. McGee and Ms. Galloway, defendant notes that plaintiff and Ms. McGee did not even work in the same branch.  Ms. McGee was a Manager in the University Programs Branch, while plaintiff was doing the work of an Education Outreach Specialist in the Elementary and Secondary Branch. See Def. Mem. at 19 and Ex.'s 1 & 2.  Furthermore, plaintiff did not have the same supervisor as Ms. McGee.  See Pl. Mem, Ex. A.  Defendant also points out that while Ms. Galloway and plaintiff both worked in the Elementary and Secondary Branch, they had different positions -- Ms. Galloway was an Educational Services Specialist while plaintiff was an Education Outreach Specialist.  See Def. Mem., Ex.'s 3 and 13.  Defendant also argues that Ms. Galloway worked as a Program Manager for more years, and managed more complex programs, than plaintiff.  See McGee Aff. ¶ 10.  She also was managing two programs and was a chairperson for the Division Curriculum Committee, while plaintiff had no comparable management experience, because his duties were principally liaison, support and assistance.  Id.  Finally, defendant notes that neither Ms. Galloway nor Ms. McGee were hired through the conversion process.

In assessing whether plaintiff is similarly situated with these other employees, the appropriate test is whether a prudent person would objectively think they are roughly equivalent.

-23-

See Molloy v. Blanchard, 115 F.3d 86, 91 (1st Cir. 1997) (quoting Dartmouth Review v.

Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989)), overruled on other grounds in Educadores

Puertorriquenos en Accion v. Hernandez, 367 F.3d 61, 64 (1st Cir. 2004).  Examining the

entirety of the evidence in the record, plaintiff has failed to establish that he was similarly

situated to any of the other NASA employees that he references.  Plaintiff had different

background experience, had different responsibilities, and in many cases had a different

supervisor.  No reasonable jury could conclude that plaintiff was similarly situated with these

employees, and thus he cannot establish the final element of a prima facie case for non-

promotion.

     Although the thrust of plaintiff's prima facie case is a comparison with other NASA

employees, and the prima facie test asks whether similarly qualified co-workers were promoted,

the D.C. Circuit has made clear that a plaintiff can establish a prima facie case by showing that

the unfavorable employment action gives rise to an inference of discrimination.  See Stella, 284

F.3d at 145 (a prima facie claim need not establish that employer hired person from outside

protected class).  In this regard, plaintiff presents an affidavit from Howard Golden, his first

supervisor at NASA, that attributes plaintiff's non-promotion to racism.  See Pl. Opp'n, Ex. 146,

December 1994 Affidavit of Howard Golden ("Golden Aff.").  Mr. Golden states that he believed

plaintiff was converted too low given his skills and that plaintiff should have been promoted

during the 1991 to 1994 time period.  Id.  Mr. Golden attributed plaintiff's non-promotion, in

part, to race, and believes that plaintiff's second level supervisor (Mr. Owens) was "prejudiced

about race."  Id.

     However, defendant is quick to point out fundamental flaws in Mr. Golden's affidavit that

prevent this evidence from being used to establish a prima facie case.  The first problem is the substance of the affidavit.  Mr. Golden was plaintiff's supervisor for only a brief period in 1991 before plaintiff was reassigned to the Education Division.  See Def. Reply, Ex. 6, June 1995 Affidavit of Howard Golden ("Golden Aff. II") at 2-3.  Mr. Golden stated that he believed plaintiff was amply qualified to be converted to a civil servant above GS-12.  See Golden Aff. at 1-2.  But as stated earlier, plaintiff did not exhaust his administrative remedy for his claim regarding his grade at conversion, and therefore cannot pursue that claim.  Most of the substance of Mr. Golden's affidavit regarding plaintiff's non-promotion, then, relates to a claim that is not before the Court.

The second flaw is that the affidavit is not based on personal knowledge regarding the failure to promote plaintiff and is therefore inadmissible hearsay that, by itself, cannot create a genuine issue of material fact.  Mr. Golden's statement that plaintiff was not promoted due to race is not based on any personal knowledge regarding plaintiff's promotion prospects from October 1991 to 1994, because Mr. Golden was not plaintiff's supervisor at that time.  See Golden Aff. at 1, 2-3.  Mr. Golden worked in a different building, did not observe interactions between plaintiff and his immediate supervisor, and spent a year and a half (roughly 1993 to 1995) working at the White House.  See Golden Aff. II at 6.  Additionally, and more importantly, in a second affidavit Mr. Golden stated that he does not have any information or knowledge as to why plaintiff was not promoted at NASA during that time period.  See Golden Aff. II at 8.  He was not involved in the promotion decisions regarding plaintiff, id., and his statement that race was the basis of plaintiff's non-promotion is thus pure speculation, not based upon personal knowledge.  His speculative assessment of the reasons for plaintiff's non-promotion cannot be

used to create a genuine issue of material fact for summary judgment.  See Anderson, 477 U.S. at 252.

Mr. Golden also stated that he heard Mr. Owens, plaintiff's second level supervisor, once use the word "nigger" to describe an African American at NASA and therefore Owens was "prejudiced about race and religion."  This statement is troubling, but it too is insufficient to establish that discrimination played a role in plaintiff's non-promotion.  Mr. Golden's testimony as to Mr. Owen's alleged bias is limited to this one racial slur.  See Fed R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced to support a finding that the witness has personal knowledge of the matter.").  Mr. Owens has specifically denied Mr. Golden's accusation.  See Def. Reply, Ex. 6, Affidavit of Frank Owens ¶ 6.  Even if plaintiff could prove to a fact-finder that Mr. Owens made the statement, however, it was not made in plaintiff's presence, or about plaintiff.  See Golden Aff. at 2.  An isolated racist statement, not directed at the plaintiff, not about the plaintiff, and not about the plaintiff's employment situation does not create any inference that discrimination played a role in an adverse employment action.  See Figures v. Board of Pub. Utils., 967 F.2d 357, 360-61 (10th Cir.1992) (in a Title VII case, evidence of racial comments is not probative of any issue in the case unless it is linked to relevant personnel actions).

Hence, even if plaintiff could establish that Mr. Owens had racial animus, plaintiff would still have to show some nexus between the racial animus and the employment decision.  See Cone v. Longmont United Hosp. Assoc., 14 F.3d 526, 531 (10th Cir. 1994) ("isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions").  That he has not done.  In fact, Mr. Golden himself states in his second affidavit that

he has no information or knowledge as to why plaintiff was not promoted.  See Golden Aff. II at

8.  An isolated allegedly discriminatory comment, not made in the plaintiff's presence or about

plaintiff, does not establish an inference of discrimination.

c.      <em>Non-Discriminatory Justification</em>

Even if the Court were to assume that plaintiff has established a prima facie case of non-

promotion, defendant has offered a legitimate non-discriminatory justification for the failure to

promote plaintiff during the relevant time period.  Principally, defendant reiterates that plaintiff

did not qualify for a promotion through an accretion of duties.  Defendant also contends that

plaintiff was given explicit directions that he would be promoted once he successfully completed

the Turner Project.  See Def. Reply, Ex. 3, Affidavit of Franklin C. Owens ("Owens Aff.") at 8-4.

According to defendant, upon approval of a formal plan with the Turner School, plaintiff would

be promoted to GS-13.  Id.  Although such explicit offers for promotion were unusual, defendant

contends it was done in this circumstance because of plaintiff's previous difficulty in managing

work, and his supervisor's sense that concrete goals would be good for him.  Id. at 8-5.

According to defendant, plaintiff submitted several versions of the Turner Plan that were

considered unacceptable, and he did not submit a final Turner Plan during the time period in

question.  Id. at 8-4; Def. Mem., Ex. 21, Affidavit of Eddie Anderson ("Anderson Aff.") at 17-11.

 Defendant also notes that plaintiff would have been promoted sooner (he eventually was

promoted in 1997) had he completed the Turner Plan consistent with agency standards.  See

Anderson Aff. at 17-11.  Although plaintiff counters that a final copy of the Turner Plan was

submitted on May 15, 1995, see Owens Aff. at 4, defendant responds that plaintiff's promotion

-27-

was contingent upon Mr. Owens' approval of the plan.[5]   Id.

### d.      *Pretext for Discrimination*

Because defendant has met its burden of production, under the McDonnell-Douglas

framework the burden shifts to plaintiff to produce evidence from which a rational fact-finder

could infer that defendant intentionally discriminated against him because of his race or religion.

Plaintiff can meet this burden by showing that defendant's justification for non-promotion was a

pretext for discrimination.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993)

(holding that "pretext" means "pretext for discrimination").  Plaintiff must establish "that a

reasonable jury could conclude from all the evidence that the adverse employment decision was

made for a discriminatory reason."  Lathram, 336 F.3d at 1088.  Resolution of that issue may

entail consideration of all relevant evidence including the strength of the prima facie case, any

direct evidence of discrimination, circumstantial evidence of the falsity of the proffered

explanation, and evidence supporting the employee's case.  See Reeves, 530 U.S. at 147-48;

Teneyck, 365 F.3d at 1151; Lathram, 333 F.3d at 1089.

Plaintiff attacks defendant's proffered justification on several grounds.  Besides reiterating

his comparative qualifications with his co-workers and Mr. Golden's affidavit, plaintiff also

argues that defendant failed properly to document his reassignment in October 1991 to the

Elementary and Secondary Branch.  See Pl.'s Statement ¶ 14.  NASA does not contest that

plaintiff, although performing work in the Elementary and Secondary Branch, did not have his

title officially changed until February 1995, nor does NASA present any evidence as to why it

---

[5]   There is no evidence in the record as to whether the Turner Plan was ultimately approved.  When plaintiff was promoted in 1997, the Notification of Personnel Action did not contain any justification for the promotion.  See Pl. Opp'n, Ex. 37.

took so long for the paperwork to be changed.  But as NASA argues, the delay in changing plaintiff's official title had no impact on his non-promotion during that period because even when his title was changed in 1995, it was determined that plaintiff should still be classified as a GS-12.  <u>See</u> Def. Reply, Ex. 8, Declaration of Alana Hogan ¶ 2 (when plaintiff's position description was reviewed by human resources it was determined he was appropriately classified GS-12).  Plaintiff does not present any evidence, beyond his mere speculation, that the delay in changing his title delayed his promotion.  <u>See</u> <u>Green v. Dalton</u>, 164 F.3d 671, 675 (D.C. Cir. 1999) (plaintiff's unsupported allegation that she was more qualified insufficient to defeat summary judgment).  Regardless of the cause of the delay in changing plaintiff's official title, the uncontradicted evidence shows that the delay did not impact his non-promotion.

Plaintiff also references the numerous letters of commendation that he received, <u>see</u> Pl. Opp'n Ex.'s 51-53, 55, and his positive performance reviews, <u>see</u> <u>id.</u>, Ex.'s 111-112.  However, these letters and ratings do not tend to show that defendant's stated reason was a pretext for discrimination.  This evidence has nothing to do with any possible discrimination by defendant.  Defendant was clear in its proffered reason for not promoting plaintiff:  he had failed to accrue the necessary responsibilities to receive a promotion.  See McGee Dec. ¶ 12.  Accretion of duties can only be accomplished by an individual raising the level of his duties, not simply by performing commendable work.  See Def. Reply, Ex. 8, Declaration of Alana R. Hogan ¶¶ 3-5.  Therefore, the fact that plaintiff may have received letters of commendation or positive ratings is besides the point. See Ezold v. Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 528 (3rd Cir. 1992) ("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories, or has, in the past, received some good evaluations.").

In assessing whether plaintiff has shown that defendant's stated justification is a pretext

for discrimination, the Court is guided by "the strength of the prima facie case, the probative

value of the proof that the employer's explanation is false, and any other evidence that supports

the employer's case." See Reeves, 530 U.S. at 147-48.  In weighing these factors on a motion for

summary judgment, all inferences are drawn in favor of plaintiff.  However, defendant's evidence

that plaintiff was not promoted because he lacked the job performance and accretion of duties

necessary to justify an upgrade was not challenged by the evidence in the record offered by

plaintiff.  Where there is no evidence that illegal discrimination played a role in an employee's

non-promotion, the Court will not sit as a "super-personnel department that reexamines an

entity's business decisions." Fischbach v. D.C. Dep't of Corrections, 86 F.3d 1180, 1183 (D.C.

Cir.1996) (internal quotations omitted).  Hence, defendant is entitled to judgment as a matter of

law because there are no material facts in dispute that would undermine (as pretextual)

defendant's non-discriminatory justification for plaintiff's non-promotion.

### 3.      Unlawful Discrimination in Personnel Actions (Count V)

Plaintiff's third claim of discrimination is based on two specific allegations.  He contends

that when NASA refused to fund his travel to a Conference of Engineering Deans of Historically

Black Colleges and Universities in September 1996 it did so because of discrimination.  See

Second Am. Comp. ¶ 143.  He also asserts that he was issued an "ultimatum" either to be

reassigned to a Maryland office or to accept a change in responsibilities if he wished to remain at

NASA headquarters.  Id. ¶ 144.  As discussed above, however, this second allegation regarding

an ultimatum was never properly put to the EEOC, and therefore plaintiff may not proceed on

that claim here.  With respect to plaintiff's allegation of denied travel, NASA contends that

plaintiff was denied permission to travel because he had already exhausted his travel funds, and the travel was not considered mission critical.  <u>See</u> Def. Mem., Ex. 19, Affidavit of Malcom Phelps ("Phelps Aff.") at 8-1.  Similarly, NASA argues that other employees who were permitted to travel with NASA funding had legitimate justifications for the travel, including mission critical activity.  <u>Id.</u> at 8-1, 8-2.

Regardless of the justifications put forth by defendant for denying plaintiff's travel request, the Court returns again to the necessary threshold element for any Title VII discrimination claim -- an adverse employment action.  It is not enough for plaintiff to say that because of the denial of travel his general stature at NASA has suffered.  <u>See</u> <u>Lu v. Billington</u>, 2005 WL 670771, *6 (D.D.C. Mar. 22, 2005) (limited travel opportunities not an adverse employment action).  Plaintiff must tie the alleged discriminatory employment action to some actual, tangible adverse employment consequence.  <u>See</u> <u>Brody</u>, 199 F.3d at 457 (plaintiff must establish "some other materially adverse consequence affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm").  Plaintiff cannot do that here.  The record is silent as to how the denial of travel may have caused plaintiff any tangible harm.  <u>See</u> <u>Murray v. Chicago Transit Auth.</u>, 252 F.3d 880, 888 (7th Cir. 2001) (denial of travel to a conference not a "tangible employment action").  Indeed, plaintiff does not even address this issue.  Instead, he focuses on the fact that others were permitted to travel while he was not.  <u>See</u> Pl. Opp'n at 43-46.  But even taking all inferences in plaintiff's favor, no reasonable jury could find that plaintiff suffered an adverse employment action as a result of being denied travel to a conference in 1996.  Hence, plaintiff cannot establish a prima facie case of

discrimination on this claim.

4.      <u>Unlawful Discrimination in Denial of Promotion (Count VI)</u>

Plaintiff's final allegation of discrimination nominally pertains to a promotion denial

during the period 1994 to 1996, <u>see</u> Second Am. Compl. ¶ 149, but actually includes a laundry

list of incidents of alleged discrimination.  Beyond the failure to promote, plaintiff also alleges

that he was assigned duties previously done by GS-13 or GS-14 employees, and that some of his

duties were reassigned to individuals at the GS-13 or GS-14 level, <u>id.</u> ¶¶ 150-152; that he was

denied travel to a conference in 1996, <u>id.</u> ¶ 153; and that Ms. McGee interfered with his

management of one of his duties, <u>id.</u> ¶ 154.   Plaintiff's allegations regarding a failure to promote

during the period 1994 to 1996, as well as the allegation that he received responsibilities

previously assigned to employees at a higher pay grade, were not properly presented to the

EEOC, as discussed above, and plaintiff cannot now pursue those claims in light of his failure to

exhaust administrative remedies.  <u>See</u> <u>Marsh</u>, 777 F.2d at 14.  Plaintiff's allegation regarding the

denial of travel to a 1996 conference was also previously addressed.  Hence, the only remaining

claims properly within count VI are plaintiff's allegations that a co-worker (Ms. McGee)

interfered with his work in 1996 and that at the time of the reorganization some of his duties and

responsibilities were given to employees at a higher grade level.

Ms. McGee was the assistant Director of the Education Division, but she had previously

managed the National Physical Science Consortium Training Grant Program (NPSC).  <u>See</u> Def.

Mem., Ex. F, Affidavit of Sherri McGee ("McGee Aff.") at 2.  As manager of NPSC, a fairly

small program, her job was to be responsible for day-to-day operations, handle people in the

programs, and deal with the budget.  <u>See</u> Def. Mem., Ex. 15, Sherri McGee Deposition at 46.

Ms. McGee found this program difficult to manage given the personalities of those involved.

<u>See</u> McGee Aff. at 2.  Eventually, plaintiff took over the responsibility for NPSC.  However, Ms.

McGee would sometimes get a call from people at NPSC asking her a question when plaintiff

was unavailable.  <u>Id.</u>  Ms. McGee would respond, but tell them to talk to plaintiff, and she would

inform plaintiff of the call.  <u>Id.</u>  In December 1996, a dispute arose over the awarding of grants in

NPSC.  <u>Id.</u> at 2-3.  During the course of this dispute, Ms. McGee offered to set up a conference

call to address the issues.  <u>Id.</u> at 3.  In her new role, it was not unusual for Ms. McGee to become

involved in a variety of programs that were having problems, including those like NPSC that she

was not directly supervising.  <u>Id.</u>  As a result of Ms. McGee's involvement, Barbara Cephas, the

grant officer, became concerned about who was monitoring the program.  <u>See</u> Pl. Opp'n, Ex. 107.

　　　Plaintiff is essentially claiming that Ms. McGee interfered with his job responsibilities.

<u>See</u> Pl. Opp'n, Ex. 106.  However, not only is this claim not leveled against NASA or any

supervisor of plaintiff, <u>see</u> <u>Jones v. District of Columbia</u>, 346 F. Supp. 2d 25, 44 (D.D.C. 2004)

(noting the distinction between harassment by a co-worker and by a supervisor), but plaintiff has

not established a prima facie case.  He has not pointed to any evidence in the record from which a

reasonable juror could find that plaintiff suffered an adverse employment action as a result of Ms.

McGee's involvement in this isolated issue.  <u>See</u> Freedman v. MCI Telecommunications Corp.,

255 F.3d 840, 847 (D.C. Cir. 2002) (denial to plaintiff of tools, which were only sometimes

required, was a minimal job interference that did not rise to the level of adverse employment

action).  Plaintiff has not shown there were any tangible effects to his employment status as a

result of this incident.  In fact, the only impact of Ms McGee's "interference" would seem to be

the e-mail Ms. McGee, not plaintiff, received from Ms. Cephas, admonishing Ms. McGee, not

plaintiff.  See Pl. Opp'n, Ex. 107.  Plaintiff speculates that Ms. McGee interfered with his

program at the behest of Mr. Owens, who sought to embarrass plaintiff.  See Pl. Opp'n at 46.

However, upon reviewing the e-mail it is not at all evident that plaintiff should have been

"embarrassed."

    Plaintiff also alleges that during the 1995 reorganization some of his responsibilities and

duties were assigned to Deborah Green Glasco,[6] who was at a higher grade level than plaintiff.

See Pl. Opp'n at 43.  Plaintiff complains that Ms. Glasco was promoted a year after taking over

some of plaintiff's responsibilities, but plaintiff was not similarly promoted.  Id.  Although

plaintiff makes these two general allegations, he does not indicate how he believes these general

factual allegations establish a prima facie case.  Plaintiff's claim regarding the reassignment of

duties does not allege an adverse employment action, and thus plaintiff cannot establish a prima

facie case for such a claim.  See Brody, 199 F.3d at 457 ("an employee suffers an adverse

employment action if he experiences materially adverse consequences affecting the terms,

conditions, or privileges of employment or future employment opportunities such that a

reasonable trier of fact could find objectively tangible harm").

    Plaintiff's claim regarding Ms. Glasco's subsequent promotion in 1996 does theoretically

assert an adverse employment action, because plaintiff's failure to be promoted is a tangible

harm.  However, plaintiff must still establish that discrimination played a role in that adverse

action.  Here, plaintiff argues that he was similarly situated to Ms. Glasco such that her

---

[6] Although Ms. Glasco was an African-American, plaintiff has also alleged discrimination
based upon sex (male) and religion (Muslim).

promotion in 1996 is evidence of discrimination against plaintiff.  But plaintiff does not direct

the Court to any evidence to show that he and Ms. Glasco were similarly qualified at the time of

her promotion or even prior to the reorganization.[7]  The record is silent on Ms. Glasco's specific

duties and responsibilities, and plaintiff's arguments on this point do not contain any citations to

the record.  Moreover, Ms. Glasco and plaintiff had different supervisors at the time of her

promotion.  See Def. Mem., Ex. 19, Affidavit of Malcolm Phelps ("Phelps Aff.") at 2 ("I

supervise Ms. Glasco, but I was not the supervisor for Mr. Nurridin at the time his promotion

was denied.  His supervisor at that time was Dr. Eddie Anderson").  As discussed earlier, having

different supervisors is a factor in determining whether employees are similarly situated.  See

Phillips, 937 F. Supp. at 37 (whether employees have same supervisor factor in determining if

they are similarly situated).  This is especially true when the supervisors are making decisions

regarding promotion.  See Phelps Aff. at 2.

### B.    Retaliation

Plaintiff's four retaliation counts mirror his discrimination claims, rehashing the same

allegations in retaliation clothing.  See Second Am. Compl. ¶¶ 80-96, 157-176.  Because of that

similarity, the four counts of retaliation can be dealt with together.[8]  The McDonnell-Douglas

---

[7] Plaintiff was promoted just a year later in 1997, see Pl. Opp'n., Ex. 37, which although not dispositive, does cast doubt on plaintiffs unsupported allegation that discrimination played a role in his 1996 non-promotion.

[8] Allegations of a failure to promote plaintiff during the period of 1994 to 1996, the alleged ultimatum issued to plaintiff, and the reassignment of duties were not administratively exhausted, and therefore as explained above cannot be pursued here as retaliation claims.  See Morgan 536 U.S. at 122 (exhaustion requirement applies to all discrete claims of discrimination and retaliation).

framework applies to retaliation claims, and to state a prima facie claim of retaliation, plaintiff must establish that (1) he engaged in a statutorily protected activity; (2) NASA took an adverse personnel action with respect to him; and (3) a causal connection existed between the two. Brody, 199 F.3d at 452; Mitchell v. Baldridge, 759 F.2d at 86.

Plaintiff contends that his "complaint of discrimination and prior reprisal to General Armstrong was the 'but for' cause of his reprimand and denied promotions and travel." Pl. Opp'n at 5. There is no dispute that plaintiff went to Gen. Armstrong in March 1994 to complain about perceived discrimination. See Pl.'s Statement ¶ 29.[9] This clearly constitutes protected activity for purposes of establishing the first element of the prima facie test. See McGowan v. Billington, 281 F.Supp.2d 238, 245 (D.D.C. 2003) (scope of statutorily protected activity is broad and includes opposition to allegedly discriminatory practices outside the EEOC process). Plaintiff first contacted the EEOC about his discrimination complaints around December 1994, which also constitutes protected activity. See Def. Mem., Ex. 8.

However, plaintiff must show as well that he suffered an adverse employment action. See Brody, 199 F.3d at 452. As discussed earlier, as to most of plaintiff's alleged incidents he cannot do so. The letter of reprimand (count III); denial of travel funds for a conference in September 1996 (counts VII and VIII); Ms. McGee's alleged interference with plaintiff's work (count VII); and reassignment of some of his duties to Ms. Glasco in 1995 (count VII) all had

---

[9] Plaintiff also contends that he complained in December 1992 to Dr. Robert Brown, Deputy Administrator, about discrimination. See Pl.'s Statement ¶ 23. There is some question as to whether plaintiff actually complained of discrimination to Dr. Brown, or whether any of his supervisors were aware of that complaint. See Anderson Aff. at 7-8. However, the specific facts of that alleged protected disclosure are irrelevant because plaintiff's complaint does not allege any retaliation between the time of his contacts with Dr. Brown and with Gen. Armstrong.

no tangible effect on plaintiff's employment, and thus are not adverse employment actions. For purposes of his retaliation claims, then, he has established an adverse employment action for only two allegations: non-promotion during the period 1991 to 1994 (count IV) and non-promotion along with Ms. Glasco in 1996 (count VII).

The final element of a prima facie retaliation case is a causal connection between the protected activity and the adverse personnel action.  See Brody, 199 F.3d at 452.  Plaintiff has not offered any direct evidence of a connection between his protected activity and the alleged adverse employment actions, and therefore he must rely on circumstantial evidence of the temporal proximity between his complaint of discrimination and his non-promotions.  See Clark Cty. School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'").  The Supreme Court has cited with approval cases that held that three and four month delays between the protected activity and the adverse action means they were not causally connected.  Id.; see also Brodetski v. Duffey, 199 F.R.D. 14, 20 (D.D.C. 2001) ("courts generally have accepted time periods of a few days up to a few months and seldom have accepted time lapses outside a year in length").

On plaintiff's claim of failure to promote during the period of 1991 to 1994, plaintiff engaged in protected activity in December 1992.  Subsequently, in March and May of 1993, Ms. McGee and Ms. Galloway, respectively, were promoted from GS-13 to GS-14.  Thus, the time between plaintiff's activity and these two incidents was three and five months for

purposes of establishing a causal connection.  Although that time frame is short, in Clark Cty.

School Dist. the Supreme Court was clear that the temporal proximity must be "very close" to

supply a causal inference.  532 U.S. at 273-74.  A three to five month time period has been

considered close enough to establish causation, see Castle v. Bentsen, 867 F.Supp. 1, 3

(D.D.C. 1994) (three to five months between protected activity and termination sufficient to

establish causation), but the Supreme Court cited with approval in Clark Cty. School Dist.

cases in which three and four month intervals were insufficient, and noted that where closeness

in time is the only evidence, the time must be very close.  532 U.S. at 273-74.  Here, there is

nothing to support the causal inference between plaintiff's protected activity and adverse

employment action other than the closeness of time.  But there is evidence that tends to negate

a causal connection.  First, plaintiff was not the only employee in the Education Division who

was not promoted at that time.  Compare Pl. Opp'n, Ex. 120, with Def. Mem., Ex. A.

Second, Ms. McGee, who was promoted in March, worked in a different branch of the

Education Division than plaintiff.  See Def. Mem., Ex. A.  And third, defendant has presented

evidence that plaintiff and these women were differently situated so as to defeat any connection

between their promotion and plaintiff's non-promotion.  Plaintiff's effort to build inference

upon inference to draw a casual connection between his protected activity and allegedly

adverse employment actions is ultimately unpersuasive.  Without a stronger showing of a

causal connection between plaintiff's non-promotion in 1993 and his protected activity, the

Court cannot conclude that plaintiff has established a prima facie case of retaliation on his non-

promotion claims.

      Even assuming plaintiff could make that showing (which he has not), a retaliation claim

follows the <u>McDonnell-Douglas</u> burden-shifting framework, and defendant has offered a legitimate nondiscriminatory justification for not promoting plaintiff during the 1991 to 1994 period.  This is the same evidence discussed at length above -- plaintiff's lack of sufficient responsibilities, his employment problems justifying a letter of reprimand, and his general experience.  Plaintiff has not offered any response on the basis of which a reasonable juror could find that defendant's proffered justifications are a pretext for retaliation.  Hence, the retaliation claim founded on plaintiff's 1991 to 1994 non-promotion must fail.

Plaintiff's final retaliation claim is that in 1996 he was not promoted along with Ms. Glasco, who had assumed responsibility for many of plaintiff's pre-reorganization duties. Here again, plaintiff has not shown any causal connection between his protected activity and this non-promotion.  In fact, plaintiff does not indicate what the specific protected activity is that he believes led to the retaliation.  Ms. Glasco was promoted in October 1996, and the most immediate protected activity engaged in by plaintiff was his first EEOC complaint in February 1995.  <u>See</u> Am. Compl. ¶ 12.  However, that is a significant amount of time (20 months) between the protected activity and the adverse employment action.  <u>See</u> <u>Brodetski</u>, 199 F.R.D. at 20 (courts usually do not accept time lapses over a year to establish causality). Plaintiff does not provide any further evidence to show a connection between this non-promotion and any protected activity. But there is evidence that shows the lack of any causal connection.  Ms. Glasco's supervisor, who approved her 1996 promotion, was not plaintiff's supervisor.  <u>See</u> Phleps Aff. ¶ 9.  Furthermore, plaintiff was in fact promoted in November 1997, only a year after the challenged non-promotion.  Although this is not dispositive on plaintiff's prima facie retaliation claim, given the lack of temporal proximity or other evidence

showing a causal connection between plaintiff's 1996 non-promotion and any protected activity, the fact that plaintiff was subsequently promoted casts doubt on his causation claim.

### C.   Hostile Work Environment

Plaintiff's last claim is for a hostile work environment.  He alleges a laundry list of incidents that he argues amount to a hostile work environment.[10]  In addition to those incidents already discussed, plaintiff also alleges that:  defendant destroyed records of travel vouchers; he received an ultimatum of reassignment or relocation; he received oral and e-mail threatened reprimands; NASA maintains education programs separated by race; and he discovered in 1995 a NASA computer with icons containing "racial jokes and stories."  See Second Am. Compl. ¶¶ 177-192.

To establish a prima facie hostile work environment claim based on race, plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment occurred because of his race; (4) the harassment affected a term, condition or privilege of his employment; and (5) the employer knew or should have known of the harassment, but failed to take any action to prevent it.  See Jones v. Billington, 12 F. Supp. 2d 1, 11 (D.D.C. 1997), aff'd, 1998 WL 389101 (D.C. Cir. June 30, 1998).  The workplace environment becomes "hostile" for purposes of Title VII only when the offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is

---

[10]  Unlike discrete claims of discrimination and retaliation, the exhaustion requirement on a hostile work environment claim is less stringent.  Plaintiff need only have filed an EEOC complaint alleging some of the claims that comprise the hostile work environment claim.  See Morgan, 536 U.S. at 122 ("A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.").

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998); accord Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); see also Pa. State Police v. Suders, 124 S.Ct. 2342, 2347 (2004); Clark Cty. School Dist., 532 U.S. at 270-271; Holbrook v. Reno, 196 F.3d at 262.

The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct constitutes an actionable hostile work environment.  Under Faragher v. Boca Raton, 524 U.S. 775, 787-88 (1998), in order to determine whether a work environment is sufficiently hostile to be actionable under Title VII, a court should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employee's performance.

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code."  Properly applied, this will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."

Id. at 787 (citations omitted).

Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status.  As the Second Circuit has explained:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel

appeals.

Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002).  Thus "to sustain a hostile work

environment claim . . . [plaintiff] must produce evidence that she was discriminated against

because of her [status]."  Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 440

(2d Cir. 1999) (claim for hostile work environment failed where only three of fifteen alleged

incidents had racial overtones); see also  Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345-

46 (7th Cir. 1999) (hostile work environment claim failed where insufficient evidence that

alleged harassing behavior was motivated by discrimination); Jones v. Billington, 12 F. Supp.2d

at 12 (hostile work environment claim failed where plaintiff had "not demonstrated that any of

the conduct of which he complains was related to his race, or that his workplace was permeated

with racially discriminatory behavior").

     Plaintiff has utterly failed to establish a prima facie hostile work environment claim.

Considering the totality of the evidence proffered, and drawing all inferences in favor of

plaintiffs, there are no genuine issues of material fact, and no reasonable jury could find that

plaintiff established a hostile work environment claim.  Simply put, plaintiff cannot meet the

high burden of showing hostility in the work environment at NASA that was "severe,"

"pervasive," and "abusive."

     First and foremost, many of the incidents cited by plaintiffs are not related to his race or

religion, and therefore cannot be used to support a hostile work environment claim.  See Burton

v. Batista , 339 F. Supp. 2d 97, 107 (D.D.C. 2004).  In fact, the only incident with explicit racial

tones was plaintiff's discovery of icons on a computer that read "racist jokes and stories" and

"W/American Heritage."  See Pl.'s Response ¶ 14.  However, plaintiff acknowledges that those folders were empty, and did not in fact contain racist jokes.  Id.  Regardless of the racist nature of those icons, it is beyond dispute that they were not directed to plaintiff.  When racial statements are not made directly to a plaintiff, generally a hostile environment cannot be established.  See Lester v. Natsios, 290 F. Supp. 2d 11, 31 (D.D.C. 2003) ("conduct directed at others rather than at plaintiff . . . is less indicative of a hostile work environment"); Gleason v. Mesirow Fin'l Inc., 118 F.3d 1134, 1144 (7th Cir.1997) ("the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff").

Another key factor in assessing the pervasiveness of the alleged harassment is the period of time over which the harassment occurred.  See Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 753 (4th Cir. 1994) (alleged incidents over a seven-year period suggests the absence of a pervasive condition).  In this case, the alleged incidents span from 1991 to 1996.  Furthermore, the specific incidents cited by plaintiff occurred intermittently over that time period: failure to promote in October 1991; a letter of reprimand in July 1994; computer icons in February 1995; an "ultimatum" received in October 1995; travel denied in September 1996; oral and e-mail threats of reprimand received in October and November 1996; and interference with his work by Ms. McGee in December 1996.  This history indicates less a pervasive pattern of harassment, and more just isolated employment incidents occurring over a long period of time.  An additional factor in the analysis is that plaintiff was in no way physically threatened by any of the alleged incidents.  See Faragher, 524 U.S. at 787-88 (factor in assessing hostility of work environment is whether plaintiff physically threatened).  Finally, the bulk of the "hostile" events on which plaintiff  relies are the very employment actions he claims are discriminatory or retaliatory; he

cannot so easily bootstrap discriminatory claims into a hostile work environment claim.  See Lester v. Natsios, 290 F. Supp. 2d at 33 ("Discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult.").

Reviewing the totality of the circumstances, including the frequency, nature, severity and offensiveness of the alleged incidents, plaintiff's claim does not meet the threshold of severe, pervasive and abusive discriminatory conduct.  All but one of the alleged incidents did not involve racially discriminatory conduct, and that one incident -- the computer icons -- was not directed at plaintiff and contained no offensive or abusive language.  Other courts have deemed circumstances that were much worse than this not to qualify as racial harassment.  See Bryant, 265 F. Supp. 2d at 64 (no hostile work environment when co-worker referred to plaintiff as "nigger" and another co-worker said "black woman were at the bottom. The white men were first, the white women were right up there with them . . . ."); Skipper v. Giant Food, Inc., 68 Fed.Appx 393, 399 (4th Cir. 2003) (no racially hostile work environment where plaintiff exposed to daily racist graffiti, overheard white co-workers using racial slurs 13 times over four years, and referred to by manager with a racial slur).

**<u>CONCLUSION</u>**

For the above reasons, defendant's motion for summary judgment is granted.  A separate

order is issued on this date.


<u>        /s/ John D. Bates             </u>
JOHN D. BATES
United States District Judge


<u>Dated:   August 17, 2005          </u>

Copies to:

Ahmad B. Nurriddin
740 Sixth Street, Southwest
Room 312
Washington, D.C.  20024
202-488-0739  (telephone)
        *Plaintiff*

Heather D. Graham-Oliver
Assistant United States Attorney United States Attorney's Office for the District of Columbia
555 Fourth Street, Northwest
Washington, D.C.  20001
202-305-1334  (telephone)
E-mail:  heather,graham-oliver@usdoj.gov
        *Counsel for Defendant*